# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOSEPH WEBSTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-cv-00162** |
| | ) | **Judge Trauger** |
| **CHERRY LINDAMOOD, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>M E M O R A N D U M</u>

The petitioner, Joseph Dejuan Webster,[1] has filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254. (Docket No. 1). The petitioner is an inmate at the South Central Correctional Facility in Clifton, Tennessee.

## I.       INTRODUCTION

The petitioner challenges the legality of his confinement under a 2006 judgment of the Criminal Court for Davidson County convicting him of the first degree premeditated murder of Leroy Owens. (R. 26-1, p. 55 ).[2] The trial court sentenced the defendant to life imprisonment to be served consecutively to a prior sentence. (*Id.*)

Webster timely appealed his conviction and sentence to the Tennessee Court of Criminal Appeals. *State of Tennessee v. Joseph Dejuan Webster,* No. M2007-00050-CCA-R3-CD, 2008 WL 2229208, at *5 (Tenn. Crim. App. May 29, 2008)(perm. app. denied. Dec. 8, 2008). The appellate

---

[1] Throughout this memorandum, Joseph Webster is referred to as "petitioner," "defendant," and "appellant" interchangeably.

[2] The citations herein are to the technical record filed by the respondent. (Docket Nos. 25, 26, 29, 30 & Attachs.). For ease of reference, the court adopts the method of record citation used by the respondent.

court affirmed, and the Tennessee Supreme Court denied Webster's application for permission to appeal.  *Id.* at ** 1, 6.

On January 23, 2009, Webster filed a petition for post-conviction relief.  (R. 25-1, p. 17).  Webster subsequently filed an amended petition, and a hearing was held on the petition for relief.  *Webster v. State*, No.  M2009-01540-CCA-R3-PC, 2010 WL 2594028, at  *1 (Tenn. Crim. App.  June 28, 2010).   The post-conviction court denied relief, and Webster appealed.  *Id.*   On June 28, 2010, the Tennessee Court of Criminal Appeals affirmed the post-conviction court's denial of relief.  *Id*.  On November 10, 2010,  the Tennessee Supreme Court issued an order denying  Webster's application for permission to appeal.  *Id*.  Webster did not file a petition for writ of certiorari in the United States Supreme Court.

On February 22, 2011, Webster filed a timely  *pro se* petition for writ of *habeas corpus* in this court.  (Docket No. 1).   On July 25, 2011, attorney Michael A. Colavecchio filed an amended petition on the petitioner's behalf.  (Docket No. 23).  In his amended petition, the petitioner asserts multiple grounds for relief.  The petitioner names Cherry Lindamood, the warden of the South Central Correctional Facility, as the respondent.

On June 13, 2011, the court conducted a preliminary examination of the petition and determined that the petitioner had stated a colorable claim for relief.   (Docket No. 15 at pp. 1-2).  Accordingly, the court entered an order directing the respondent to answer or otherwise respond to the petition.  (Docket No. 15).  The respondent filed a motion dismiss the action on November 17, 2011.  (Docket No. 35).  The court ordered the petitioner's counsel to respond to the motion to dismiss (Docket No. 38), and a response was filed (Docket No. 42).

Upon consideration of the record, the court concludes that an evidentiary hearing is not needed. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003)(an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). Therefore, the court shall dispose of the petition as the law and justice requires. Rule 8(a), Rules — § 2254 Cases.

Jurisdiction and venue in this court are appropriate under 28 U.S.C. § 2241(d) because the petitioner was convicted in the Criminal Court for Davidson County in Nashville, Tennessee.

## II. SUMMARY OF THE EVIDENCE

### A. Trial Court

The following summary of the facts of the case is taken from the opinion of the Tennessee Court of Criminal Appeals in *State v. Webster,* 2008 WL 2229208:

> In April of 2005, Appellant was indicted for the first degree murder of Leroy Owens that occurred on November 22, 1998. At trial, Tammy Nelson testified that she was living in an apartment complex at 159 Hermitage Avenue in November of 1998. She and Leroy Owens, the victim, were friends. She knew the victim as "Little Nick," and he would sometimes stay at her apartment. Ms. Nelson and the victim had used drugs together in the past.
>
> According to Ms. Nelson, around the beginning of November, a man named Robert Nichols, who was known as "Big Nick," wanted "some dope." The victim offered to call his "cousin" who had some "good stuff." Two men, one of whom was Appellant, arrived at Ms. Nelson's apartment. The men claimed that the victim already owed them some money. The victim and "Big Nick" pooled their money together and "got the drugs" from the two men. The men left the apartment. Ms. Nelson was under the impression that the victim and "Big Nick" were going to divide the drugs up for resale to make some money, but "Big Nick scammed Little Nick out of his money."
>
> About three days later, Appellant and the other man that brought the drugs, returned to Ms. Nelson's apartment, looking for the victim. Ms. Nelson specifically identified Appellant as one of the men that

came to her door. The men came to her apartment five or six times looking for the victim. At some point, the two men gave Ms. Nelson a pager number and told her to call them when she saw the victim. On November 21, 1998, the victim came to her house. The victim and Ms. Nelson got high together, and the victim stayed the night at her apartment. Ms. Nelson called the pager number to let the men know that the victim was at her apartment. The two men arrived at Ms. Nelson's apartment in a white station wagon on the morning of November 22, 1998. When they arrived, the victim was asleep. Ms. Nelson woke the victim up to tell him that Appellant and the other man were there to see him. Appellant went to the car where Ms. Nelson saw him put on gloves and get a stick. The other man "snatched" the victim out of the front door of Ms. Nelson's apartment. Ms. Nelson saw Appellant start hitting the victim with his hands. The victim took off running, escaping over a fence. As he was running away, one of his black tennis shoes came off his foot. Appellant and the other man got into their car to chase the victim. About thirty minutes later, Ms. Nelson learned that the victim was dead.

The victim ran to Delunn Todd Hyde's house. According to Mr. Hyde, the victim entered his house without being invited inside. The victim looked like he had been beaten up, was missing a shoe and had bruises under his eye. The victim's pants were "halfway down." The victim acted "scared" and asked to use Mr. Hyde's telephone. Mr. Hyde did not want to get involved, so he escorted the victim out of his house. The victim asked Mr. Hyde to look outside to see if there was a white car. Mr. Hyde reported that he did not see a white car. At that point, the victim "took out across the street running." Mr. Hyde then saw a white "souped up" station wagon coming over the hill toward the victim. The car "flew right behind" the victim. Mr. Hyde could tell that there were two black men in the car and remembered that he had seen the same car the night before on Lewis Street. About thirty minutes after the victim left his house, Mr. Hyde walked to the scene of the incident and learned that the victim was dead.

Fred McClain testified that on November 22, 1998, he was "doing some concrete" work for a small restaurant on the corner of Green Street and Wharf Avenue. FN1 Around 11:30 a.m., Mr. McClain heard a car pull up and brakes "screeching." The next thing he saw was a "man running." The man running turned out to be the victim, Leroy Owens. He also saw a "white car that pulled up, that the two fellows jumped out of." The two men were black and one of the men was about five feet nine inches tall and weighed about two hundred and twenty-five or two hundred and thirty pounds. The other man

was smaller, "about five eight and weighed about one seventy-five." The car was an older white station wagon with "chrome wheels."

FN1. According to Mr. McClain, at the time of trial the name of Wharf Avenue had been changed to Charles E. Davis.

The two black men from the car "bum rushed" or "tackled" the victim while he was running. This caused the victim to actually bump into Mr. McClain, who hit his head on the food service window of the restaurant. Mr. McClain got up and ran around a corner to the side of the building. When he peered around the corner, he saw the larger of the two men standing over the victim, who was lying on the ground. The larger man was hitting the victim with a cinder block. Mr. McClain heard the man ask, "Where's my goddamn money?" Mr. McClain saw the man hit the victim twice with the cinder block before the two men left in the station wagon. Once the two men left, Mr. McClain could see blood running out of the victim's head where he had been hit with the block. The victim was silent and still. Mr. McClain was unable to identify the attackers.

Officer James Jordan of the Metropolitan Nashville Police Department responded to a call at 11:33 a.m. on November 22, 1998, reporting the beating of the victim. When he arrived on the scene, Officer Scott Baswell was already present. The victim was lying on the ground in a large pool of blood. The victim's skull was exposed, and there was a large cinder block lying next to the body within a foot of the victim's head.

Detective Brad Corcoran and Detective Pat Postiglione investigated the murder of the victim. Around 7:00 p.m. on the day of the murder, Detective Corcoran and Detective Postiglione went to 1245 Lewis Street and spoke with a woman named Katrina Norman. At the time, Ms. Norman was Appellant's girlfriend. At the time of trial, she was married to Appellant and went by the name Katrina Webster.FN2 Detective Corcoran informed Ms. Norman that he was trying to locate Appellant and the white station wagon that had been described by several witnesses. Ms. Norman told Detective Postiglione that she knew the owner and driver of the car but refused to identify them. Ms. Norman, who had Appellant's first name, "Joseph," tattooed on her neck, was uncooperative and actually became "very defensive" during questioning. At trial, Ms. Norman testified that she did not know anything about the victim's murder. She also denied that she told the police she knew the owner and driver of the white station wagon.

FN2. For consistency, we will refer to her as Ms. Norman throughout the opinion.

Detective Postiglione was the first person to interview Ms. Nelson. She initially denied knowing the victim but later explained what occurred on the day of his murder. Ms. Nelson identified Appellant from a photographic lineup. She also identified Appellant at trial. According to Detective Postiglione, Ms. Nelson was "fearful," "upset and crying."

At trial, Dr. Feag Lindthp, an assistant medical examiner, testified that the victim sustained multiple blunt force injuries to the head that resulted in several abrasions and lacerations. The victim also had multiple skull fractures and hematoma. There was hemorrhaging of the brain stem, and the victim's brain itself was bruised in several places. In Dr. Lindthp's opinion, the victim's death was caused by multiple blunt force injuries to the head.

Appellant took the stand in his own behalf. He claimed that he did not remember what he did on November 22, 1998. Appellant denied ever owning a white station wagon. Further, Appellant claimed that he did not know Tammy Nelson. Appellant stated that he was dating Ms. Norman at the time of the incident and that she lived on Lewis Street.

At the conclusion of the trial, the jury found Appellant guilty of first degree premeditated murder. The trial court sentenced Appellant to life in prison, to be served consecutively to the sentences Appellant was already serving for felony drug charges. Appellant filed a motion for new trial in which he argued that he had "obtained newly discovered evidence that was not available to counsel at the time of trial." Attached to the motion were affidavits from Marie Burns, Appellant's mother; Katrina Norman, Appellant's wife; and Arthur Gordon, Appellant's brother. The affidavits alleged that Appellant's brother, Kenneth Neal, was the owner of the white station wagon and was the perpetrator who killed the victim. Appellant later filed an amended motion for new trial in which he raised additional grounds for relief.

The trial court held a hearing on the motion for new trial. At that hearing, several witnesses took the stand, including: Marie Burns, Appellant's mother; Arthur Gordon, Appellant's brother; Katrina Norman, Appellant's wife; Kenneth Neal, Appellant's brother; Phillip

Cotton, a friend of Mr. Neal; and Appellant.

Marie Burns testified that her son Kenneth Neal was the owner of the white station wagon. Ms. Burns admitted that she was questioned in 1998 by Detective Postiglione about the white station wagon. She claimed that Detective Postiglione never asked if Appellant owned the white station wagon. She did not tell the detective that Mr. Neal was the owner of the car. Ms. Burns claimed that Appellant told her prior to being arrested for the victim's murder that Mr. Neal "went out south and killed that man," but that she never told anyone about it because Appellant told her he "didn't want to see [her and Appellant's wife] hurt." According to Ms. Burns, she approached counsel for Appellant immediately after trial and told her that Mr. Neal killed the victim. In fact, Ms. Burns claimed that Mr. Neal admitted to the murder.FN3 Ms. Burns stated that she had a conversation with Mr. Neal prior to Appellant's trial in which Mr. Neal told her that the jury would not convict Appellant of the crime because he and Appellant "don't look alike" and that he was the one that "did it." Ms. Burns was afraid to tell anyone, but thought that after Appellant was convicted, it was time to come forward with the information.

FN3. There was an audiotape admitted into evidence at the hearing that allegedly contained a conversation between Mr. Neal and Ms. Burns in which Ms. Burns accused Mr. Neal of committing the crime. After listening to the audiotape, it appears to be of a conversation between Ms. Norman, referred to in the tape as "Trina," and Mr. Neal. During the discussion, from what we could understand, Ms. Norman expresses her frustration with Mr. Neal's lack of monetary assistance to support Appellant's defense. We could not locate a portion of the tape in which there was a conversation between Ms. Burns and Mr. Neal. The conversation between Ms. Norman and Mr. Neal appears to be followed by a tape recording of a lecture on Tennessee history and the Chickasaw Treaty.

Arthur Gordon testified that his brother, Mr. Neal, told him that he committed the murder that Appellant was convicted of committing, but he could not remember when that conversation occurred. On cross-examination, Mr. Gordon stated that the conversation may have occurred about "three weeks" after the murder. Mr. Gordon also informed the court that Mr. Neal owned a white station wagon in 1998. Mr. Gordon testified that Mr. Neal told him that the car was taken to Kentucky and "destroyed."

Katrina Norman Webster testified at the hearing on the motion for new trial. She claimed that she knew that Mr. Neal committed the murder in 1998, but did not tell anyone about it because she was scared of Mr. Neal. She decided to come forward with the information after trial because her husband was convicted for a crime that he did not commit.

Kenneth Neal denied that he owned a white station wagon in 1998. He admitted that Ms. Burns questioned him about the murder but claimed that he walked out the door instead of talking to her about the murder. When asked why he did not specifically deny committing the murder, Mr. Neal responded, "I didn't have a reason to say anything about it."

At the conclusion of the hearing, the trial court took the matter under advisement. In a written order, the trial court denied the motion for new trial, determining:

"The proof ... showed that the defendant, his mother, his wife and his other brother all knew about the alleged confession before the trial. However, they all chose to not inform the defendant's lawyer about this potential piece of evidence. The timing of the entire family revelation causes the Court great concern about the legitimacy of the information. There has been no proof to indicate that the defendant attempted to procure Kenneth Neal's presence at trial and the Court finds the allegations raised at this late date unbelievable. Therefore, the defendant did not exercise reasonable diligence in searching for the evidence prior to trial as he knew about the evidence prior to trial and made no efforts to have Kenneth Neal available to testify at trial. This quite simply is not newly discovered evidence. Therefore, this issue is without merit."

*Id.* at **1-5.

## B.    Post-Conviction Court

The Tennessee Court of Criminal Appeals set forth the evidence presented at the post-conviction hearing in its opinion affirming the denial of relief by summarizing the testimony of each witness as follows:

The post-conviction court held a hearing on the petition for relief. At the hearing, Robert Lyons, a private investigator for Petitioner's trial

counsel, testified that he interviewed State witness Tammy Nelson twice in October of 2005. These interviews took place about seven years after the victim's death and after the police had taken a formal statement from Ms. Nelson. According to Mr. Lyons, Ms. Nelson could not identify the two "short black males" who murdered the victim. Additionally, she was unable to provide any distinguishing characteristics of the perpetrators.

Petitioner presented the testimony of Dr. Ulysses Walls, a Nashville dentist. Dr. Walls testified that in 1995 or 1996, he placed six permanent gold teeth in Petitioner's upper jaw. The teeth were distinct in that they had the initials "JW" on them. Dr. Walls saw Petitioner as a patient a second time. At this visit, Dr. Walls noticed that Petitioner had more gold teeth on the lower jaw. Dr. Walls did not place the gold teeth on Petitioner's lower jaw. Dr. Walls was unable to provide medical records of Petitioner's visits due to a burglary at his office.

Petitioner testified at the hearing that by the end of 1996 he had a total of twelve gold teeth, six on the upper jaw and six on the lower jaw. At this time, Petitioner would have been sixteen or seventeen years old. According to Petitioner, the top teeth bore the initials "JW" as well as "a dollar sign." Petitioner did not recall whether he testified at trial that he was eighteen years old when he got his gold teeth.

Trial counsel took the stand at the post-conviction hearing. He and another attorney represented Petitioner at trial and on appeal. Trial counsel confirmed that he hired Investigator Lyons to help with the investigation of the case. Trial counsel was present during one of the interviews of Ms. Nelson and used transcripts of that interview to cross-examine Ms. Nelson at trial. Trial counsel was surprised that Ms. Nelson made such a solid witness at trial and commented that he was frustrated when she stuck "to her guns."

Trial counsel first met Petitioner in 1998, when Petitioner hired trial counsel to represent him in a murder case. Petitioner was acquitted in the 1998 case. Trial counsel could not recall whether Petitioner had gold teeth at that time. Trial counsel did recall that Petitioner had gold teeth at the trial and remembered arguing the issue of the gold teeth to the jury. Trial counsel did not recall specific details about his cross-examination of Ms. Nelson but admitted that the transcript reflected that he did not question her about the gold teeth. Further, trial counsel admitted that he did not call a dentist to testify about

when the teeth had been mounted. Trial counsel explained that he did not question Ms. Nelson about prior inconsistent statements because "[s]he was a steadfast either well-coached witness or just a good witness" and he felt that "strategy-wise" it was better to "back off."

Trial counsel recalled filing a motion to dismiss the case prior to trial because of the delay between incident and indictment. However, trial counsel did not recall the specifics of the argument because it was handled by co-counsel. Trial counsel felt that they could not show any prejudice due to the delay.

Trial counsel recalled that he did not present any evidence in mitigation at the sentencing hearing. Trial counsel determined that there was no mitigating evidence to present and that Petitioner's extensive criminal history supported the consecutive sentencing ordered by the trial court.

Trial counsel recalled the hearing on the motion for new trial. Trial counsel explained that his argument was based on newly-discovered evidence that warranted a new trial. Specifically, Petitioner's mother claimed immediately after the verdict that her other son committed the murder. Trial counsel only raised issues in the motion for new trial and on appeal that he thought had "the most merit."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In an order issued at a later time, the post-conviction court denied relief, determining that trial counsel effectively cross-examined Ms. Nelson and found "no proof to support [Petitioner's] allegation that the cross-examination was ineffective. Further, the post-conviction court determined that trial counsel's decisions were tactical. With regard to issues of identity, the post-conviction court accredited the testimony of trial counsel in that he "chose to proceed on the issues which he felt had the most merit." The post-conviction court determined that Petitioner's prior criminal history was extensive and trial counsel was not ineffective for failing to present proof at sentencing. Moreover, Petitioner did not present proof that he was prejudiced by not receiving a speedy trial. Specifically, the post-conviction court determined that, as a whole:

"[T]he testimony of trial counsel [is accredited] that he made strategic trial decisions. Despite the petitioner's assertions and assumptions that specific questions would have changed the outcome of the verdict, the Court finds that counsel was effective in his representation of the petitioner. The petitioner has failed to prove the

factual allegations by clear and convincing evidence. As to the petitioner's claims of ineffective assistance of appellate counsel, the Court finds that counsel strategically chose to pursue the issues he felt had the most merit and that petitioner has failed to prove the allegations by clear and convincing evidence."

*Webster v. State,* 2010 WL 2594028, at **1-6.

## III.   DISCUSSION

Of the nine claims identified by the court, most of them concern federal constitutional issues that were fairly presented to the Tennessee state courts for consideration as required by 28 U.S.C. § 2254(b)(1)(A) and, as such, are properly before this court for review under § 2254(d).  A few of them, as identified below, either were never presented at all in state court, or were presented under a different theory than that presented to the state court.  As set forth herein, the court finds that none of the petitioner's claims provide a valid basis for *habeas* relief.

### A.       Standard of Review for Fully Exhausted Claims

Even when a petitioner's application for a writ of *habeas corpus* raises a federal constitutional claim that has been exhausted properly in the state courts, this court's review of the state court's resolution of the issue is quite limited.  The standard for reviewing applications for the writ of *habeas corpus* is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  The section states:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Where state courts have made factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The purpose of federal *habeas corpus* review is to "ensure that state court convictions are given effect to the extent possible under the law," not to conduct a federal re-trial. *Bell v. Cone*, 535 U.S. 685, 693 (2002).

**B.      Standard of Review for Defaulted Claims**

Generally, a federal district court will not entertain a petition for writ of *habeas corpus* unless the petitioner has first exhausted all available state court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine that promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal *habeas corpus* relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.").

Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313,

322 (6th Cir. 1998). Once a petitioner's federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[3]

A *habeas* petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal *habeas* review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a *habeas* petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, *habeas* petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22; *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

However, if an unexhausted claim would be procedurally barred under state law, for instance, by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on *habeas* review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). In order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a

---

[3] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 393, 402 (6th Cir. 2003)(quoting Tenn. S. Ct. R. 39).

"fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

With these principles in mind, the court will proceed to consider Webster's claims.

## C.      Analysis of Claims

### 1.      Denial of Motion for a New Trial Based on Newly Discovered Evidence/Actual Innocence

In the first ground of the amended petition (Docket No. 23 at p. 4), the petitioner challenges the decisions of the state courts on his claim of newly discovered evidence.   After his conviction, the petitioner sought a new trial on the basis that he had new evidence that his brother actually committed the crime of which the petitioner was convicted.  (R. 26-1, pp. 56-62).  The trial court denied the motion for new trial, finding that Webster knew about the information prior to trial and that the testimony concerning this allegedly newly discovered evidence was not credible.  (R. 26-1, pp. 78-79).  The Tennessee Court of Criminal Appeals affirmed, finding that "[t]he record in this case amply supports the finding that Appellant's witnesses at the new trial hearing were not credible. Moreover, if they are to be believed at all, they and Appellant knew about this alleged evidence yet did not come forward.  This clearly shows a lack of reasonable diligence."  (R. 29-3, pp. 7-8).

A petition for federal *habeas corpus* relief may only be granted when it is found that a citizen is in custody in violation of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  Because federal *habeas corpus* relief is only available to remedy errors of a federal nature, a claim that a conviction is the result a state court's misapplication of state law is not cognizable unless the petitioner can establish such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States

14

Constitution. *Floyd v. Alexander*, 148 F.3d 615, 619 (6th Cir. 1998); *see Abshear v. Moore*, 354 Fed. Appx. 964, 968 (6th Cir. 2009)(federal *habeas corpus* relief does not lie for errors of state law).

In its motion to dismiss the instant petition for writ of *habeas corpus* relief, the respondent maintains that any <u>federal</u> claim in relation to the petitioner's claim of newly discovered evidence or actual innocence is unexhausted and procedurally defaulted. (Docket No. 35 at p. 6).

The petitioner's motion for new trial does not contain any references to federal law. (R. at 26-1 at p. 56). The trial court did not rely on federal law in denying the motion for new trial. *State v. Webster,* 2008 WL 2229208, at *4. In the "Statement of Issues" section of the petitioner's brief on direct appeal, Webster contends that the trial court erred in denying his motion for new trial in violation of "the provisions of the Federal and State Constitution, namely: Due Process Clause (5th and 14th Amendments; Article 1, section 8 and 17); Equal Protection Clause (14th Amendment; Article XI section 8); Effective Assistance of Counsel (6th Amendment; Article I section 9); Right to Trial by an Impartial Jury (6th Amendment; Article I, section 9) on the grounds that are more fully set forth" in the petitioner's brief. (Docket No. 29-1, p. 6). However, in the brief itself, the petitioner argues that the trial court erred by citing to Tennessee state law only. (*Id.* at pp. 10-11). There is no discussion of any federal law violations in the brief and no mention of federal claims other than the string citation to federal law in the "Statement of Issues" section.

In affirming the trial court's denial of the petitioner's motion for new trial based on newly discovered evidence, the state appellate court cited only to Tennessee state cases; no federal rights or claims were mentioned. *State v. Webster,* 2008 WL 2229208, at *5. The court therefore finds that the petitioner has procedurally defaulted on any federal claims regarding the newly-discovered-

evidence. A petitioner cannot raise procedurally defaulted claims in a federal *habeas* proceeding unless he or she can demonstrate "cause" for the procedural default and "actual prejudice" resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485-86 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). The petitioner here fails to allege cause or prejudice for his procedural default.

Alternatively, procedural default may be excused if a petitioner can show that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U .S. 722, 750 (1991). To come within this narrow second exception, a petitioner must make a showing of actual innocence, meaning factual innocence. *McCleskey v. Sant*, 499 U.S. 467, 494-95 (1991); *Dretke v. Haley*, 541 U.S. 386, 393–94 (2004). The standard for showing a "fundamental miscarriage of justice" is higher than the standard for showing cause and prejudice. *Murray*, 477 U.S. at 496.

In the petitioner's memorandum filed in support of his *habeas* petition, the petitioner's newly discovered evidence claim is expanded to include a claim of actual innocence. (Docket No. 23 at pp. 9-13). Stated simply, the petitioner maintains that he is innocent of the crime of which he was convicted and that, if the jury had heard testimony from various witnesses that the petitioner's brother was the one who committed the crime, the jury could not have reasonably convicted the petitioner. (*Id.*)

The United States Supreme Court has held that if a *habeas* petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo*,

513 U.S. 298, 316 (1995). Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counsels, however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id*. at 321.

Here, although the newly discovered evidence touted by the petitioner "was not presented at trial" and therefore technically is "new," *Schlup*, 513 U.S. at 324, the evidence was known to the petitioner and his family prior to the conclusion of the petitioner's trial. Specifically, at the petitioner's motion for a new trial hearing, the petitioner's mother (Marie Burns),[4] the petitioner's wife ( Katrina Norman Webster)[5], and the petitioner's brother (Arthur Gordon)[6] all testified that they

---

[4] Marie Burns testified that her son Kenneth Neal was the owner of the white station wagon. She admitted that Detective Postiglione asked her about the white station wagon in 1998 but claimed that he never asked if the petitioner owned the white station wagon. She did not tell the detective that Neal was the owner of the car. Burns claimed that the petitioner told her prior to being arrested for the victim's murder that Neal "went out south and killed that man," but she never told anyone about it because the petitioner told her he "didn't want to see [her and Appellant's wife] hurt." Burns stated that she had a conversation with Neal prior to the petitioner's trial in which Neal told her that the jury would not convict the petitioner of the crime because he and the petitioner "don't look alike" and that he was the one that "did it." According to Burns, she approached counsel for the petitioner immediately after the trial and told her that Neal killed the victim. (Docket No. 29-3 at pp. 4-5).

[5] Katrina Norman Webster testified that she had known that  Neal had committed the murder, but had not told anyone because she was scared of Neal.  She testified that she decided to come forward with the information after trial because her husband was convicted of a crime that he did not commit.  (Docket No. 29-3 at p. 5).

[6] Arthur Gordon testified at the petitioner's motion for new trial that his brother Kenneth Neal told Gordon that he had committed the murder, but Gordon could not remember when that conversation had occurred. He informed the court that Neal owned a white station wagon and that Neal had told him the car had been "destroyed." (Docket No. 29-3 at p. 5).

knew Mr. Neal allegedly had committed the murder of the victim prior to the petitioner's trial, but had not informed the petitioner's counsel or the police about this information for various reasons. According to the hearing testimony of Ms. Burns, the petitioner himself knew that Mr. Neal committed the murder; however, during his trial when the petitioner testified on his own behalf, he failed to say that it was his brother who had committed the murder for which the petitioner was on trial.[7]

As explained by the state appellate court, when the alleged newly discovered evidence was presented by way of the testimony of the petitioner's mother, wife, and brother at the petitioner's motion for a new trial hearing, the trial court found that the witnesses' testimony was not credible. (Docket No. 29-3 at p. 5). In particular, the court held: "The timing of the entire family revelation causes the Court great concern about the legitimacy of the information." (Docket No. 29-3 at p. 5). Due to its timing and lack of credibility, the new evidence does not raise "sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Schlup,* 513 U.S. at 317.

The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). The petitioner has made no such showing. His claims are thus barred by procedural default and do not warrant *habeas* relief.

### 2. Ineffective Assistance of Counsel

As the second ground of his petition for *habeas corpus* relief, the petitioner contends that he received ineffective assistance of counsel by his attorney, Michie Gibson. (Docket No. 23, p. 4 ¶

---

[7] During the petitioner's motion for a new trial, Kenneth Neal denied that he owned a white station in 1998. He admitted that Ms. Burns questioned him about the murder but claimed that he did not talk with her about it. When asked why he did specifically deny committing the murder, Mr. Neal responded, "I didn't have a reason to say anything about it." (Docket No. 29-3 at p. 5).

5.2).  The petitioner alleges eight (8) specific ways in which he believes his counsel was ineffective. This claim includes allegations concerning counsel's (1) cross-examination of Tammy Nelson; (2) failure to object to Detective Postiglione's testimony; (3) failure to present evidence at the motion to dismiss hearing; (4) failure to present evidence at sentencing; (5) failure to preserve issues for appeal; (6) conduct of jury selection; (7) presentation of trial strategy during opening statement; and (8) failure to call alibi witnesses.  (Docket No. 23, pp. 13-32).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant.  *See Bell v.  Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness.   *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000).   In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."   *Strickland*, 466 U.S. at 690-91.   Reasonable attorneys may disagree on the appropriate strategy for defending a client.  *Bigelow v. Williams,* 367 F.3d 562, 570 (6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Strickland,* 466 U.S. at 694; *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012).  To establish prejudice in the context of a guilty plea, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985); *Miller v. Straub*, 299 F.3d 570, 578 (6th Cir. 2002).

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence.  *Strickland,* 466 U.S. at 695.  "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'"  *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)(*en banc*)).  "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Strickland*, 466 U.S. at 689.

As discussed below, this court cannot conclude under the applicable law that counsel's conduct was constitutionally deficient, or that the state court's rejection of the petitioner's ineffective assistance claim involved an unreasonable determination of the laws in light of the evidence presented during the state court proceedings, or that the state court's decision was contrary to, or involved an unreasonable application of, the standard established by *Strickland*.  28 U.S.C. § 2254(d).

### a.   Whether counsel was ineffective in the cross-examination of Nelson

The petitioner asserts that trial counsel's cross-examination of Tammy Nelson, in particular

with regard to her identification of the petitioner as perpetrator, was constitutionally deficient. (Docket No. 23 at pp. 13-17). The petitioner raised this claim in state post-conviction proceedings, and the post-conviction court denied relief, determining that trial counsel effectively cross-examined Nelson and finding "no proof to support [Petitioner's] allegation that the cross-examination was ineffective." *Webster v. State*, 2010 WL 2594028, at *6. The post-conviction court also found that

trial counsel's decision to "back off" was tactical, pointing to trial counsel's post-conviction hearing testimony that:

> . . . when I sense that a witness is making points with the court or the jury, I kinda lay back. And I thought– I–in my career I have been successful in cross-examining, you know, witnesses; and I feel like that's, in my opinion, one of my better, you know, strengths as an attorney. But I wasn't getting anywhere with Ms. Nelson. She was a steadfast either well-coached witness or just a good witness. She was a very good witness for the State. And–and, strategy-wise, if I feel like I'm not getting anywhere, I'm gonna back off.

(Docket No. 25-2 at p. 112). *Id.* The Tennessee Court of Criminal Appeals affirmed, finding:

> At the post-conviction hearing, trial counsel testified that he was surprised that Ms. Nelson was such a good witness for the State. He expressed frustration by the fact that she was "[sticking] to her guns" during her testimony. Trial counsel did not recall specific things about which he cross-examined Ms. Nelson at trial but explained that he did not feel like he was "getting anywhere" because she was such a "good witness" so his strategy was to "back off." The post-conviction court accredited the testimony of trial counsel. The record supports the post-conviction court's determination.

(Docket No. 30-3 at p. 11).

Although the petitioner disagrees with trial counsel's decision to "back off" the cross-examination of Nelson because the petitioner believes trial counsel could have elicited more or different information from the witness, "cross-examination is a strategic and tactical decision of trial

21

counsel which is not be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief "so long as counsel's choices are informed ones based upon adequate preparation." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001)(quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)(internal quotations omitted)).

Here, there is no evidence that trial counsel's preparation for Webster's trial was inadequate. The proof adduced at the post-conviction hearing was that trial counsel ended the cross-examination as a matter of strategy after he observed that the witness would not budge in her testimony. The post-conviction court accredited trial counsel's testimony, and this court has no basis for discrediting it.

Accordingly, the court finds that the state courts' determination that the trial counsel's cross-examination of Nelson was not constitutionally deficient is supported by the record and is neither contrary to, nor an unreasonable application of, clearly established federal law. This claim will not support an award of *habeas corpus* relief.

> **b.** **Whether counsel was ineffective in failing to object to Detective Postiglione's testimony concerning statements made by the petitioner's girlfriend**

The petitioner next asserts that trial counsel was ineffective in failing to object to Detective Postiglione's testimony concerning statements purportedly made by the petitioner's girlfriend. (Docket No. 23 at pp. 18-21 ). The petitioner contends that, at a minimum, trial counsel should have requested a limiting instruction so that the testimony could only be used for impeachment purposes. (*Id.*)

The petitioner raised this claim in his state post-conviction proceedings, and the post-

conviction court denied relief. *Webster v. State*, 2010 WL 25494028, at \*6. Considering the claim on appeal of the denial of post-conviction relief, the state appellate court reviewed the transcript of the petitioner's post-conviction hearing and found that the petitioner had failed to present any proof as to how this alleged deficiency on the part of counsel might have altered the outcome of his trial. *Id.* at \*8. In affirming the post-conviction court's denial of relief on this ineffective assistance of counsel claim, the state appellate court also found that the petitioner's allegations of prejudice were pure speculation. *Id.*

The instant petition alleges that "[t]he testimony elicited by the state from and through witness Detective Postiglione were [sic] prejudicial and inflammatory" because the girlfriend's account of the events initially had matched the petitioner's account of the events but she subsequently changed her testimony. According to the petitioner, the girlfriend's change in testimony (as relayed by Detective Postiglione), made the petitioner's account of the events seem less credible. (Docket No. 23 at pp. 20-21).

The court has reviewed Detective Postiglione's direct testimony at trial, as well as his testimony during cross-examination. (Docket No. 26-2 at pp. 119-66). The record does not support the allegations made by the petitioner. Instead, the record reflects that trial counsel made numerous hearsay objections throughout Detective Postiglione's testimony, most of which were sustained by the court. (*See id.* at pp. 123-24, 155, 157). The state courts' determinations that trial counsel's performance with regard to Detective Postliglione was not constitutionally deficient is supported by the record and is neither contrary to, nor an unreasonable application of, clearly established federal law. Consequently, the court finds that this claim will not support an award of *habeas corpus* relief.

   c.   **Whether counsel was ineffective for failing to present evidence in support of the motion to dismiss**

Next, the petitioner alleges that trial counsel was ineffective by failing to present proof in support of the petitioner's motion to dismiss after an alleged prosecutorial delay. At the petitioner's post-conviction hearing, trial counsel recalled filing a motion to dismiss the case prior to trial because of the delay between incident and indictment. *Webster v. State*, 2010 WL 2594028, at *5. However, trial counsel did not recall the specifics of the argument because it was handled by co-counsel. *Id.* Trial counsel remembered that the petitioner would have been required to show prejudice in the delay, and trial counsel did not feel that they could show the prejudice required to secure relief. *Id.* The post-conviction court accredited the testimony of trial counsel and found that the petitioner had not presented proof that he was prejudiced by not receiving a speedy trial. *Id*. at *6. The Tennessee Court of Appeals affirmed. *Id*. at *8.

In an attempt to show prejudice now, the petitioner argues that "if" he had an alibi witness, the witness would have become unavailable due to the prosecution's unreasonable delay. (Docket No. 23 at p. 22). However, the petitioner's latest argument also rests on speculation.

The court finds that the state courts' determination that the trial counsel was not constitutionally ineffective in failing to present proof to support a motion to dismiss is supported by the record and is neither contrary to, nor an unreasonable application of, clearly established federal law. Consequently, the court finds that this claim will not support an award of *habeas corpus* relief.

### d. Whether counsel was ineffective for failing to present certain evidence at sentencing

Next, the petitioner alleges that counsel was ineffective because he failed to present mitigating evidence at the petitioner's sentencing hearing. (Docket No. 23 at pp. 22-24). At the petitioner's post-conviction hearing, counsel explained that he did not present mitigating evidence because there was none to present. *Webster v. State*, 2010 WL 2594028, at *8. The post-conviction

court accredited trial counsel's testimony. *Id.* The appellate court noted that the petitioner's extensive criminal history supported consecutive sentencing and concluded the petitioner failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel. *Id*.

A defense attorney's failure to reasonably investigate a defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). Defense counsel must either perform a reasonable investigation or make a reasonable decision that such investigation is unnecessary. *Wiggins*, 539 U.S. at 521. A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. *See Draper v. Adams,* No. 98–1616, 2000 WL 712376, at **3-4 (6th Cir. May 23, 2000).

*Strickland* directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Id.* at 691.

Here, the petitioner argues that counsel should have presented evidence that would have shown the petitioner's "remorse." (Docket No. 23 at p. 23). However, the petitioner does not explain what particular mitigation evidence he believes counsel should have presented at sentencing that would have demonstrated remorse and how that mitigation evidence, if it had been presented,

would have reduced the petitioner's sentence. As such, even if counsel's performance at sentencing fell short of what is required by *Strickland*, the petitioner has not demonstrated prejudice.

The petitioner also argues that counsel should have "presented evidence" or argued at the petitioner's sentencing hearing that the petitioner should not have received consecutive sentences. (Docket No. 23 at p. 23). At the petitioner's post-conviction hearing, counsel explained that he did not make this argument because, in his opinion, the petitioner's extensive criminal history supported the consecutive sentencing ordered by the trial court. *Webster v. State*, 2010 WL 2594028, at *6.

In view of the petitioner's prior record, the petitioner has not carried his burden of proving that the appellate court would have granted relief had counsel argued against consecutive sentencing. As the Sixth Circuit has observed, "our role on habeas review is not to nitpick gratuitously counsel's performance. After all, the constitutional right at issue here is ultimately the right to a fair trial, not to perfect representation." *Smith v. Mitchell*, 348 F.3d 177, 206 (6th Cir. 2003). Under the circumstances, the petitioner received "constitutionally adequate representation." *Pillette v. Berghuis*, 408 F. App'x 873, 891 (6th Cir. 2010).

The court finds that, in reaching its decisions on these claims, the Tennessee Court of Criminal Appeals made reasonable determinations of the facts in light of the evidence in the state court record and reasonably applied the standards set forth in *Strickland*, resulting in a decision that is neither contrary to nor an unreasonable application of clearly established federal law. Like the petitioner's other claims, the court finds that this claim will not support an award of *habeas corpus* relief.

### e. Whether counsel was ineffective for failing to preserve issues for appeal

The petitioner next contends that counsel was ineffective because he failed to preserve issues

necessary for appellate review in the motion for a new trial. In his amended petition, the petitioner identifies seven (7) issues that he believes counsel should have raised in his motion for new trial and on appeal. (Docket No. 23 at pp. 31-32).

The petitioner raised this ineffective assistance claim in his petition for post-conviction relief. During the petitioner's post-conviction hearing, trial counsel testified that he only raised issues on appeal that he thought had "the most merit." *Webster v. State*, 2010 WL 2594028, at *6. With regard to the petitioner's claim that counsel should have challenged the admission of the crime scene and autopsy photographs in the motion for new trial, trial counsel testified that he did not think this issue "would have any effect at the Court of Appeals." *Id.* at *9. The post-conviction court found that, "[a]s to the petitioner's claims of ineffective assistance of appellate counsel, the Court finds that counsel strategically chose to pursue the issues he felt had the most merit and that petitioner has failed to prove the allegations by clear and convincing evidence." *Id.* at *6.

The Tennessee Court of Criminal Appeals affirmed, finding that:

> Petitioner also argues that counsel was ineffective on appeal, specifically, for failing to preserve issues necessary for appellate review in the motion for new trial. As stated above, trial counsel testified that he only pursued issues on appeal that he felt had "merit." The post-conviction court accredited the testimony of trial counsel that this was a tactical decision. Again, this Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See Adkins*, 911 S.W.2d at 347.

*Id.* at *9.

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional

judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d at 579 (internal quotations omitted). In fact, winnowing out weaker issues on appeal is actually "the hallmark of effective appellate advocacy." *Id*. (quoting *Smith v. Murray*, 477 U.S. at 536).

In this case, counsel testified that he had practiced law for twenty years and that his method was to "file motions, throughout the course of any case; and [he'll] decide which ones [he] think[s] have the most merit and take them up." (Docket No. 25-2 at p. 73). Counsel testified that he believed that the petitioner's claim of newly-discovered evidence was actually a claim of actual innocence, and counsel believed this claim was very strong and might have presented "a case of first impression" (Docket No. 25-2 at p. 83) due to the "extraordinary, certain facts [counsel] had gotten right after the trial." (Docket No 25-2 at p. 79). As to the other issues he could have raised on appeal, counsel stated during a deposition: "I didn't ignore them. I don't think they have as much merit as you do." (Docket No. 25-2 at p. 84).

The post-conviction court accredited the testimony of trial counsel that he made a tactical decision not to pursue the other claims in order to focus on what he believed was a very strong and perhaps novel claim. Although it does appear that reasonable attorneys could disagree as to whether counsel should have presented the one claim he pursued on appeal as a claim of newly-discovered evidence or a claim of manifest injustice/actual innocence, the court is not persuaded that it would have made a difference either way. The petitioner has not carried his burden of proving that the appellate court would have granted relief had counsel raised the other issues on appeal.

The court finds that, in reaching its decisions, the Tennessee Court of Criminal Appeals

made reasonable determinations of the facts in light of the evidence in the state court record and reasonably applied the standards set forth in *Strickland*, resulting in a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. Like the petitioner's other claims, the court finds that this claim will not support an award of *habeas corpus* relief.

      f.    **Whether counsel was ineffective in conducting jury selection, in failing to present a trial strategy during opening statement, and in failing to call two alibi witnesses**

Three of the petitioner's claims of ineffective assistance of counsel were not raised in the state appellate court: whether counsel was ineffective (1) in conducting jury selection; (2) in failing to present a trial strategy during opening statement; and (3) in failing to call alibi witnesses.[8] Having failed to raise these claims in the state appellate court, the petitioner is barred by the post-conviction statute of limitations and restrictions on successive state petitions from presenting these claims to the state court now. Tenn. Code Ann. §§ 40-30-102(a), -102(c), and -117. Because petitioner has not fully and fairly presented these claims to the state courts, and a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted but procedurally precluded from federal *habeas* review unless the petitioner can demonstrate cause and actual prejudice to overcome the default, or a miscarriage of justice (i.e., a colorable claim of factual innocence in light of federal constitutional error). *Coleman v. Thompson*, 501 U.S. at 752–53.

As to the three claims of ineffective assistance of counsel that are procedurally defaulted, Webster has not established cause or prejudice for his default. Although he maintains his actual innocence, consideration of the petitioner's defaulted claims would not serve to avoid a miscarriage

---

[8] The three claims were raised in the state post-conviction petition but not on appeal of the denial of the post-conviction petition.

of justice or to establish his innocence, as discussed at length above. (*See supra* pages 14-19). Thus, review of these claims is barred by procedural default.

For all of the reasons explained above, the petitioner has failed to establish by clear and convincing evidence that he is entitled to relief on the basis of ineffective assistance of counsel.

## IV. CERTIFICATE OF APPEALABILITY

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[A] COA does not require a showing that the appeal will succeed." *Miller-El,* 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

Because the petitioner has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue with respect to the petitioner's first ground for relief (denial of a motion for new trial based on newly discovered evidence).

As to the petitioner's ineffective assistance of counsel claims, although reasonable jurists could debate whether Webster's trial counsel was deficient in some respects, the petitioner has not

"made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The court will therefore deny a COA as to all of the petitioner's claims.

## V.  CONCLUSION

For the reasons set forth herein, the court finds that Webster's petition is without merit. Accordingly, on all grounds, the petition will be denied.   Rule  4, Rules - - - § 2254 Cases.  The petitioner's claims will be dismissed with prejudice, and a certificate of appealability will not issue as to any of those claims.

An appropriate order will enter.

Aleta A. Trauger
United States District Judge